**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| ALEXSAM, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 2:20-cv-00081-JRG-RSP |
| | § | (LEAD CASE) |
| CIGNA CORPORATION, CIGNA | § | |
| HEALTH AND LIFE INSURANCE | § | |
| COMPANY, CONNECTICUT | § | |
| GENERAL LIFE INSURANCE | § | |
| COMPANY, and CIGNA | § | |
| HEALTHCARE OF TEXAS, INC., | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| UMB FINANCIAL CORPORATION and | § | Case No. 2:20-cv-00082-RSP |
| UMB BANK N. A., | § | (MEMBER CASE) |
| | § | |
| *Defendants.* | § | |

## CLAIM CONSTRUCTION MEMORANDUM AND ORDER

On April 14, 2021, the Court held a hearing to determine the proper construction of disputed terms in United States Patent No. 6,000,608.  Before the Court is the Corrected Opening Claim Construction Brief (Dkt. No. 58), filed by Plaintiff Alexsam, Inc. ("Plaintiff" or "AlexSam" or "Alexsam"), the Responsive Claim Construction Brief (Dkt. No. 59), filed by Defendants Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Healthcare of Texas, Inc., UMB Bank, N.A., and UMB Financial Corp. (collectively, the "Defendants"),  and  Plaintiff's reply (Dkt. No. 60). The parties also filed joint claim construction charts pursuant to P.R. 4-3 (Dkt. No. 36) and P.R. 4-5(d) (Dkt. No. 62).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, considered the intrinsic evidence, and making subsidiary factual findings

about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

I. BACKGROUND ................................................................................................... 4

II. LEGAL PRINCIPLES ......................................................................................... 6

III. AGREED TERMS ............................................................................................... 10

IV. DISPUTED TERMS ............................................................................................. 10

   1. "multifunction card system" .......................................................................... 11

   2. "debit/medical services card" ........................................................................ 14

   3. "medical card" ................................................................................................ 17

   4. "medical services card" .................................................................................. 23

   5. "debit card" .................................................................................................... 25

   6. "a unique identification number" ................................................................... 29

   7. "encoded" ....................................................................................................... 34

   8. "a bank identification number approved by the American Banking Association" .............. 35

   9. "banking network" ......................................................................................... 39

   10. "transaction processor" ................................................................................ 42

   11. "processing hub" .......................................................................................... 45

   12. "first database when the card functions as a debit card" ............................. 49

   13. "second database when the card functions as a medical card" .................... 49

   14. "medical identification number" .................................................................. 56

   15. "unmodified existing standard point-of-sale device" .................................. 59

V. CONCLUSION .................................................................................................... 60

# I. BACKGROUND

Plaintiff alleges infringement of United States Patent No. 6,000,608 ("the '608 Patent"). Dkt. No. 58 at Ex. A.  Plaintiff submits that "[t]he '608 Patent covers a variety of important technologies relating to the debit card industry," and "[t]he multifunction card system disclosed in the '608 Patent enabled consumers and retailers to use existing point-of-sales devices, the existing banking infrastructure, and a bank identification number (BIN) to perform financial transactions . . . ." Dkt. No. 58 at 1.

The '608 Patent, titled "Multifunction Card System," issued on December 14, 1999, and bears a filing date of July 10, 1997.  The Abstract of the '608 Patent states:

> Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card.  Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device.  The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system.  The processing hub coordinates the various databases corresponding to the various functions of the card.

Various courts, including this Court, have construed disputed terms in the '608 Patent:

> *Alexsam, Inc. v. Datastream Card Services, Ltd., et al.*, No. 2:03-CV-337, Dkt. No. 199 (E.D. Tex. June 10, 2005) (Ward, J.) ("*Datastream*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 2–21 of 183 of Exhibit E);

> *Alexsam, Inc. v. Humana Inc.*, No. 2:07-CV-288, Dkt. No. 114 (E.D. Tex. Aug. 28, 2009) (Ward, J.) ("*Humana*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 22–38 of 183 of Exhibit E);

> *Alexsam, Inc. v. UnitedHealth Group Inc., et al.*, No. 2:07-CV-512, Dkt. No. 102 (E.D. Tex. Dec. 2, 2010) (Everingham, J.) ("*UnitedHealth*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 39–41 of 183 of Exhibit E);

> *Alexsam, Inc. v. IDT Corp.*, No. 2:07-CV-420, Dkt. No. 105 (E.D. Tex. June 29, 2010) (Ward, J.) ("*IDT*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 42–60 of 183 of Exhibit E);

*Alexsam, Inc. v. Pier 1 Imports, Inc.*, No. 2:08-CV-15 (E.D. Tex. Aug. 17, 2011) (Everingham, J.) ("*Pier 1*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 61–63 of 183 of Exhibit E);

*Alexsam, Inc. v. Best Buy Co., Inc., et al.*, No. 2:10-CV-93, Dkt. No. 180 (E.D. Tex. Apr. 9, 2012) (Craven, J.) ("*Best Buy*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 64–103 of 183 of Exhibit E);

*Alexsam, Inc. v. Best Buy Co., Inc., et al.*, No. 2:10-CV-93, Dkt. No. 331 (E.D. Tex. Nov. 14, 2012) (Schneider, J.) (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 104–115 of 183 of Exhibit E);

*Alexsam, Inc. v. Green Dot Corp., et al.*, No. 2:15-CV-05742, Dkt. No. 112 (C.D. Cal. June 14, 2016) (Snyder, J.) ("*Green Dot*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 116–141 of 183 of Exhibit E);

*Alexsam, Inc. v. Green Dot Corp., et al.*, No. 2:15-CV-05742, Dkt. No. 124 (C.D. Cal. Sept. 12, 2016) (Snyder, J.) (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 142–145 of 183 of Exhibit E);

*Alexsam, Inc. v. MasterCard Int'l Inc.*, No. 1:15-CV-2799, Dkt. No. 186 (E.D.N.Y. June 11, 2018) (Gold, J.) ("*MasterCard*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 146–166 of 183 of Exhibit E); and

*Alexsam, Inc. v. MasterCard Int'l Inc.*, No. 1:15-CV-2799, Dkt. No. 237 (E.D.N.Y. June 17, 2020) (Glasser, J.) (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 167–183 of 183 of Exhibit E).

The parties have also discussed another case regarding the patent-in-suit that is pending in the District of Utah.  *See Alexsam, Inc. v. HealthEquity, Inc.*, 477 F. Supp. 3d 1227 (D. Utah 2020) (Nielson, J.) (denying a motion to dismiss based on 35 U.S.C. § 101).

In the present case, Defendants moved to strike Plaintiff's original opening claim construction brief as exceeding the page limit; Defendants also moved to exclude evidence that was allegedly not timely disclosed.  *See* Dkt. No. 51.  The Court granted Defendants' motion.  Dkt. No. 57, Mar. 8, 2021 Order.  Plaintiff then filed its Corrected Opening Claim Construction Brief. Dkt. No. 58.  In their Responsive Claim Construction Brief (Dkt. No. 59), Defendants argue that

Plaintiff's Corrected Opening Claim Construction Brief cites evidence that had been stricken by the Court.  Dkt. No. 59 at 1 (citing Dkt. No. 57).

Even if considered, the evidence challenged by Defendants (*see* Dkt. No. 51 at 4) does not significantly affect the claim construction analysis set forth in the present Claim Construction Memorandum and Order, except as to the prior claim construction orders such as *Datastream*, *Humana*, *UnitedHealth*, *IDT*, and *Green Dot* (cited above).  All of these orders are cited by Plaintiff in the parties' P.R. 4-3 statement.  *See* Dkt. No. 46, Ex. B.  To whatever extent Plaintiff did not adequately cite these prior claim construction orders as to all disputed terms for which Plaintiff cites these prior claim construction orders in Plaintiff's claim construction briefing, consideration of prior claim construction orders is customary and appropriate, and Defendants do not show how any unfair prejudice would result from the Court's consideration of prior claim construction orders regarding the patent-in-suit.  This is particularly true given that Defendants have had an opportunity to respond to these prior orders in Defendants' responsive claim construction brief and at the April 14, 2021 hearing, and Defendants have indeed done so.  *See* Dkt. No. 51 at 5.  As to the other challenged evidence, this evidence does not significantly affect the claim construction analysis set forth in the present Claim Construction Memorandum and Order, so to whatever extent Defendants still seek relief, any such relief is denied as moot.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.  Those preliminary constructions are noted below within the discussion for each term.

## II.  LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips*, 415 F.3d at 1312 (quoting

*Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For

example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *See id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.  *Id.* at 1316.  In these situations, the inventor's lexicography governs.  *Id.*  The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex*, 299 F.3d at 1325.  But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context and/or scope for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").  "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that

may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *See id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The United States Supreme Court has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120.

"[P]rior orders in related cases do not bar the Court from conducting additional construction in order to refine earlier claim constructions." *TQP Dev., LLC v. Intuit Inc.*, No. 2:12-

CV-180-WCB, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J., sitting by designation).

In general, however, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP*, 2014 WL 2810016, at *6 ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva*, 135 S. Ct. at 839–40 ("prior cases will sometimes be binding because of issue preclusion and sometimes will serve as persuasive authority") (citation omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)).

## III.  AGREED TERMS

In the January 12, 2021 Joint Claim Construction Chart filed pursuant to P.R. 4-3 (Dkt. No. 46 at 2) and in the March 23, 2021 Joint Claim Construction Chart filed pursuant to P.R. 4-5(d) (Dkt. No. 62, Ex. A at A-4), the parties submit they have agreed that the term "card data" in Claim 32 of the '608 Patent means "data contained on the card."

## IV.  DISPUTED TERMS

The parties, in their respective briefing, organize the disputed terms slightly differently. Rather than attempt to divine an ideal ordering and arrangement of the disputed terms, the Court uses the numbering of disputed terms set forth in Plaintiff's opening brief.

**1.  "multifunction card system"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>In the alternative, "a card system that can serve a number of functions" | "a card system that serves at least two different functions" |

Dkt. No. 46, Ex. A at 1; Dkt. No. 58 at 8; Dkt. No. 59 at 3; Dkt. No. 62, Ex. A at A-1.  The parties submit that this term appears in Claims 32 and 33.  Dkt. No. 62, Ex. A at A-1.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "preamble term is not limiting."  Plaintiff agreed with the Court's preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that "the term 'multifunction card system' appears only in the preamble of the Asserted Claim 32 and is not limiting such that no construction is necessary."  Dkt. No. 58 at 9.  Plaintiff submits that this is consistent with the Court's finding in *Datastream* that the term "multifunction card system" is limiting where it appears in the body of a claim but not where it appears only in the preamble.  *Id.*  Alternatively, Plaintiff proposes the construction adopted in *Datastream*, *Humana*, and *IDT*.  *Id.*  "Finally," Plaintiff argues, "it is important to note that the construction proposed by Defendants is facially improper as it requires the system to serve two different functions even though claims of the '608 Patent use the term in circumstances where the system is performing only one function."  *Id.*

Defendants respond that "[a]s written, the claimed system 'accesses' multiple databases, and the claimed card 'functions' as distinct cards when it accesses each database . . . ."  Dkt. No. 59 at 4.  Defendants urge that "[t]he language of the asserted claims requires multiple performed

functions," and "the specification provides no reason to question the unambiguous meaning."  *Id.*
at 5.

Plaintiff replies that the Court in *Datastream* properly found that the preamble is not
limiting.  Dkt. No. 60 at 2 (citation omitted).

At the April 14, 2021 hearing, the parties presented oral arguments regarding this term
together with their arguments regarding the term "debit/medical services card," addressed below.

(b)  Analysis

> In general, a preamble limits the invention if it recites essential structure or steps,
> or if it is "necessary to give life, meaning, and vitality" to the claim.  *Pitney Bowes*[,
> *Inc. v. Hewlett-Packard Co.*], 182 F.3d [1298,] 1305 [(Fed. Cir. 1999)].
> Conversely, a preamble is not limiting "where a patentee defines a structurally
> complete invention in the claim body and uses the preamble only to state a purpose
> or intended use for the invention."  *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d
> 1550, 1553 (Fed. Cir. 1997).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *see, e.g.,*
*Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in
the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble
may act as a necessary component of the claimed invention."); *C.W. Zumbiel Co. v. Kappos*, 702
F.3d 1371, 1385 (Fed. Cir. 2012) (finding preambles limiting because "'containers' as recited in
the claim body depend on 'a plurality of containers' in the preamble as an antecedent basis").

Here, the term "multifunction card system" appears only in the preamble of Claim 32,
which recites (emphasis added):

> 32.  A *multifunction card system* comprising:
> a.  at least one debit/medical services card having a unique identification
> number encoded on it comprising a bank identification number approved by the
> American Banking Association for use in a banking network;
> b.  a transaction processor receiving card data from an unmodified existing
> standard point-of-sale device, said card data including a unique identification
> number;

12

> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
>
> d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

In *Datastream*, the Court found: "With respect to those instances in which the term appears in the preamble, the court holds that it is not a claim limitation." *Datastream* at 11 (citing, as an example, Claim 57).

In some cases, a preamble may be limiting if it states a "fundamental characteristic of the claimed invention," "serves to focus the reader on the invention that is being claimed," or "states the framework of the invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006). Also, a preamble may be limiting if it sets forth a feature "underscored as important by the specification." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) (quoting *Catalina*, 289 F.3d at 808). Additionally, in some cases, "[w]hen a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)).

In the present case, Defendants note that the Field of the Invention section of the specification of the '608 Patent uses the term "multifunction card system":

> The present invention relates generally to debit card systems, both bank-issued and non-bank-issued, and more particularly to a *multifunction card system* that can be accessed by a variety of standard point-of-sale devices, by phone, by fax, or over the Internet.

'608 Patent at 1:6–8 (emphasis added).

Yet, the body of above-reproduced Claim 32 already expressly recites a limitation regarding "when the card functions as a debit card" and "when the card functions as a medical card." In other words, the body of the claim already explicitly refers to particular functions.

13

On balance, the applicable principle is "the presumption against reading a statement of purpose in the preamble as a claim limitation." *Marrin v. Griffin*, 599 F.3d 1290, 1294–95 (Fed. Cir. 2010); *see Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002) ("Generally, the preamble does not limit the claims."); *see also Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 769–71 (Fed. Cir. 2018) (in preamble reciting "[a] computer network for providing an information delivery service for a plurality of participants," finding "information delivery service" to be non-limiting because it "merely describe[s] intended uses for what is otherwise a structurally complete invention"). Thus, the claim "defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina Mktg.*, 289 F.3d at 808 (citing *Rowe*, 112 F.3d at 478).

In short, this is not a case in which the patentee "use[d] both the preamble and the body to define the subject matter of the claimed invention." *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).

The Court therefore hereby finds that the term **"multifunction card system,"** which appears in only the **preamble** of Claim 32, is **not limiting**.

## 2. "debit/medical services card"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a card that can function as both a debit card and a medical services card" | "a card that functions as both a debit card and a medical services card" |

Dkt. No. 46, Ex. A at 1; Dkt. No. 58 at 10; Dkt. No. 59 at 3; Dkt. No. 62, Ex. A at A-1. The parties submit that this term appears in Claim 32. Dkt. No. 46, Ex. A at 1; Dkt. No. 62, Ex. A at A-1.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a card that can function as both a debit card and a medical services card." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that although this term does not appear in the specification, the claim can be readily understood such that "there is no requirement that the card access a system that actually performs both functions, only that the system be *capable* of performing the functions."  Dkt. No. 58 at 11; *see id.* at 10–11.

Defendants respond: "The system accesses one of two databases '*when* the card functions' as a debit or medical card, respectively.  Had the patentee meant for either function to be optional, the claim would have read '*if* the card functions.'"  Dkt. No. 59 at 5.

Plaintiff replies that Defendants' argument "mistakenly conflates system claims and method claims" and "conflicts with the specification."  Dkt. No. 60 at 3.

At the April 14, 2021 hearing, Defendants stressed that the claimed system requires a card that is actually capable of accessing multiple different databases, not a card that is merely capable of being programmed to do so.  Plaintiff agreed that the card must be capable of functioning in the two different manners set forth in the claim.  Plaintiff also cited authority that the word "when" can be conditional ("in view of the fact that; in the event that; if") rather than necessarily temporal ("at or during") or mandatory.  *See FlatWorld Interactives LLC v. Samsung Elecs. Co., Ltd., et al.*, No. 12-804-LPS, Dkt. No. 130 (D. Del. Dec. 31, 2014) (Stark, J.).

(b)  Analysis

Claim 32 recites (emphasis added):

32.  A multifunction card system comprising:
    a. at least one *debit/medical services card* having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
    b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;

15

> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
>
> d. said processing hub accessing a first database when *the card* functions as a debit card and said processing hub accessing a second database when *the card* functions as a medical card.

The term "debit/medical services card" does not appear in the written description portion of the specification.

Defendants argue that all four limitations—including limitation "d" that includes the "when the card functions . . ." limitations that are the focus of the present dispute—are "drafted in the present participle" verb form, and "AlexSam does not—and cannot—argue that all of the other limitations drafted in the present participle are also optional, as that would leave the claim with no limitations at all."  Dkt. No. 59 at 5.

But Plaintiff does not argue that the "when the card functions . . ." limitations are optional. Rather, Plaintiff argues that "the card must only be *capable of* performing the functions described in the claims, not actually perform them."  Dkt. No. 58 at 10.  Plaintiff's interpretation is consistent with the overall form of the claim, which is directed to a system rather than a method.  *Cf. Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (in finding that an apparatus claim did not recite method steps and therefore was not an impermissible mixed method-apparatus claim, noting that the claim "is clearly limited to a . . . processor possessing the recited structure and *capable* of performing the recited functions").  This interpretation is consistent with the legal principle cited by both sides that "[t]he claim construction inquiry . . . begins and ends in all cases with the actual words of the claim."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

This is consistent with disclosure in the specification regarding "a need for a card system which *can* serve a number of functions."  '608 Patent at 3:2–7 (emphasis added); *see id.* at 10:61–

16

64 ("The system 108 can access each of the databases discussed above and can simultaneously increase or decrease each database as needed by the type of transaction occurring.").

This is also consistent with the Court's background discussion of Claims 32 and 33 in *Humana*:

> In this case, Alexsam has asserted claims 32 and 33 of the '608 patent against Humana.  Those claims involve a system that relates to debit and medical services cards along with the associated debit and medical-related databases.   The debit/medical card is associated with an account that maintains medical funds, such as a medical savings account, and is used to authorize financial transactions.  The same card may also provide access to medical information such as Medicare information for the patient or the patient's medical history.

*Humana* at 3.  *Humana* rejected a proposal to limit the disputed term, finding that "the specification of the '608 patent does not 'repeatedly reinforce' the usage of the term 'medical services' to mean 'medical information' that would relate only to a patient's medical history."  *Id.* at 9 (citation omitted).  *Humana* also rejected a proposal of the phrase "can be used," instead stating: "The Court notes that the patent consistently describes the cards as capable of performing 'functions.'"  *Id.* at 10.  *Humana* construed "debit/medical services card" to mean "a card that can function as both a debit card and a medical services card" (*id.*; *see UnitedHealth* at 2 (adopting *Humana* construction)), and Plaintiff proposes this construction in the present case.

Based on the above-discussed evidence and authorities, the Court construes **"debit/medical services card"** to mean **"a card that can function as both a debit card and a medical services card."**

**3.  "medical card"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "a card that allows access to a database containing medical information" | "a card that provides access to a separate database that contains a card holder's medical information/history and card account funds" |

Dkt. No. 46, Ex. A at 1; Dkt. No. 58 at 12; Dkt. No. 59 at 6; Dkt. No. 62, Ex. A at A-5.  The parties

submit that this term appears in Claim 32.  Dkt. No. 46, Ex. A at 1; Dkt. No. 62, Ex. A at A-5.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with

the following preliminary construction: "a card that allows access to a database containing medical

information."  Plaintiff agreed with the Court's preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that whereas "AlexSam's proposed construction is consistent with both the

Specification and prior claim construction orders of this Court" in *Humana* and *UnitedHealth*,

"Defendants' proposed construction has already been rejected in part while other aspects, which

are thinly veiled attempts to introduce non-infringement arguments, are uncertain and confusing."

Dkt. No. 58 at 12.  Plaintiff also argues that "Defendants have proposed a construction that raises

more questions than it answers," and "the *card* allows access by initiating a transaction – it does

not *provide* access, . . . which is performed by other elements of the claimed system."  *Id.* at 13.

Defendants respond that "[t]he '608 Patent (including asserted claims 32 and 33) uses

'*medical services card*' and '*medical card*' synonymously to claim a card that facilitates

'accessing' a distinct database (a 'second database') containing the card holder's medical

information/history so the medical information may be retrieved by a medical services provider."

Dkt. No. 59 at 6–7 (footnote omitted).  Defendants argue "Claim 32 expressly provides that 'when

the card functions as a medical card,' the processing hub must access a completely different

database – 'a second database,' and 'when the card functions as a debit card,' the processing hub

must access a separate and distinct 'first database.'"  *Id.* at 7.  Defendants submit that "AlexSam's

construction is designed to improperly allow a juror to conclude that 'debit card' information and

'medical services card'/'medical card' history information may be in the same database, which is

18

directly contrary to the '608 Patent and the express language of the claims." *Id.* Defendants argue

the Court's prior *Humana* and *UnitedHealth* constructions should be reevaluated, given that

Plaintiff recently stipulated to a different construction in *MasterCard*. *Id.* at 7–8. Finally,

Defendants argue:

> The '608 Patent requires and uniformly explains that, on the one hand, the "medical information database" 207 (the "second database" in asserted Claims 32 and 33) stores medical information/history, *not* "debit card" data, which is stored in a separate database (the "first database"), and is solely associated with and when the card functions as a "medical services card"/"medical card." ['608 Patent] at 10:12–14. On the other hand, the separate and distinct "Debit Card" Database, "Loyalty Card Database" 206, and "Electronic Gift Certificate ('ECG') Database" 205 are dedicated to containing different information and accessed only when the multifunction card functions as a "debit card," "loyalty card," or "EGC card," respectively, not as a "medical services card"/"medical card." *Id.* at 8:22–24; 9:16–20; 9:46–52; 9:65–10:2; 10:3–6; FIG. 2.

*Id.* at 10.

Plaintiff replies that the same arguments presented by Defendants in the present case were

considered and rejected in *Humana*. *See* Dkt. No. 60 at 4. As to Defendants' proposal of referring

to "card account funds," Plaintiff argues that "the claim language plainly associates access to funds

to the 'debit card' functionality." *Id.*

At the April 14, 2021 hearing, the parties argued this term together with the term

"debit/medical services card."

(b)  Analysis

Claim 32 recites (emphasis added):

32. A multifunction card system comprising:
   a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
   b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;

> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
>
> d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a *medical card*.

The contrast between "a debit card" and "a medical card" in limitation "d" reflects the distinction between "debit" and "medical" (or perhaps between "debit" and "medical services") in limitation "a." The term "medical card" appears only in the claims, but the Background of the Invention section of the specification provides an example regarding medical information:

> [I]n order to obtain a patient's medical history, the patient or his or her doctor must request the appropriate files from the patient's previous doctor(s). It often takes a number of days to receive the requested information. In a medical emergency, this delay is often far too long. Thus, there is a need for patients to have control over their own medical history data. Further, there is a need for this data to be instantly available to the patient.

'608 Patent at 2:56–63. The specification provides further context by disclosing:

> [T]he multifunction card system 108 of the present invention is capable of providing an information retrieval card. In an exemplary embodiment, a medical information card which allows access and retrieval of a patient's complete medical history from a multitude of remote locations is provided. Each participating patient's medical information is stored in a record in a medical information database 207 maintained at the processing hub 103. The record contains the identification number encoded on the patient's card 101.
>
> When medical history information data is needed, it may be requested by swiping the card 101 through a POS device 105 at a participating doctor's office or hospital. Preferably, a PIN is entered into the POS device 105 to ensure that only an authorized person is able to request the information. The POS device 105 would then send the request to the processing hub 103 via one of the routes described above. When the processing hub 103 receives the request from the authorized requester, it then immediately sends the information to the requestor via means preselected by the participating doctor's office or hospital. Such means may include electronic mail, facsimile, voice response, and other similar means. The medical history information may be updated by the patient or his or her doctor or insurer by forwarding new information to the operator of the system 108 via an on-line connection, over the Internet, by telephone, by facsimile, or by mail.

*Id.* at 10:8–32. This disclosure also continues by referring to medical funds:

20

> In order to allow a cardholder to keep track of medical savings accounts or various other means for paying for medical services (e.g., Medicare), the system 108 also allows access to a database which maintains the medical funds for the cardholder. As described above under the Electronic Gift Certificate™ section, the system 108 is able to authorize, reject, and cause money to be transferred based upon the cardholder's available medical funds.

*Id.* at 10:40–47.

Defendants' expert opines that "[t]he '608 Patent uses the words 'medical information' and 'medical history' interchangeably to mean and define the same thing," and Defendants' expert cites portions of the above-reproduced disclosure for support.  Dkt. No. 59, Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶ 51.

Defendants' expert's opinions in this regard are unpersuasive, as is Defendants' expert's conclusion that "the 'medical services card'/'medical card' must provide access to both (i) medical information/history and (ii) card account funds."  *Id.* at ¶ 53; *see id.* at ¶¶ 51–53.  Instead, these disclosures regarding a "medical information card" ('608 Patent at 10:10–11) demonstrate that medical information *may include* medical history.

Likewise, in *Humana* the parties disputed whether the term "medical card" requires facilitating "retrieval of the patient's medical history information" or instead "refers to the function of accessing any medical-related database."  *Humana* found:

> [T]he Court also disagrees with Humana that the patent claim is so narrow as to encompass only the patient's medical history information.  Humana points to several places in the specification that disclose access to "medical information."  In light of this disclosure, Humana argues that the Court should ignore the single instance of disclosure in the specification that suggests that the card may be used "to keep track of medical savings accounts or various other means for paying for medical services."  *See* '608 patent, 10:40–47.  More specifically, the specification discloses that the card may be used to access a Medicare database.  *ld.*  Given that a patient's Medicare account is neither a "debit" account nor a "medical history information" account, the Medicare database fails to fit into either of the two categories that Humana suggests would be encompassed by this claim.  The Court refuses to read out an embodiment disclosed in the specification.  *See Vitronics v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (noting that a construction

which would result in excluding the preferred embodiment "is rarely, if ever, correct").  The Court finds that there is sufficient support in the specification to allow the scope of this claim term to extend more broadly to all databases that contain "medical information."

The Court construes this term as: "A card that allows access to a database containing medical information."

*Humana* at 11–12.  *UnitedHealth* adopted this construction (*see UnitedHealth* at 2), and this is the construction that Plaintiff proposes in the present case.

Defendants argue that "AlexSam's construction is designed to improperly allow a juror to conclude that 'debit card' information *and* 'medical services card'/'medical card' history information may be in the same database, which is directly contrary to the '608 Patent and the express language of the claims."  Dkt. No. 59 at 7.  Defendants contrast the disclosure of "medical information database 207" with the disclosure of other databases such as "loyalty card database 206."  *Compare* '608 Patent at 10:12–14 *with id.* at 8:22–24, 9:16–20, 9:46–52, 9:63–67, 10:3–6; *see id.* at FIG. 2.

Defendants also point out that the parties in the *MasterCard* case stipulated that "medical card" means: "A card that allows access to a database containing medical information specific to the cardholder or someone associated with the card holder with respect to the medical information accessed."  *MasterCard* at 9.

The claim, however, contains other language directed to "accessing a first database" and "accessing a second database."  *See* '608 Patent at Cl. 32 ("said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card").  Defendants' proposal of "[a] card that provides access to a *separate* database" should therefore be rejected.

Finally, as to Defendants' proposal of referring to a database that contains "card account funds," the specification refers to "a database which maintains the medical funds for the cardholder" but does *not* state that those funds reside in the same database as medical information. *See* '608 Patent at 10:40–47.  Further, even assuming for the sake of argument that this disclosed embodiment includes medical funds residing in the same database as medical information, Defendants do not justify importing any such feature into the claim construction.  *See Phillips*, 415 F.3d at 1323.

The Court therefore hereby construes **"medical card"** to mean **"a card that allows access to a database containing medical information."**

### 4. "medical services card"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning in light of "debit/medical services card" and "medical card" | "a card that provides access to a separate database that contains a card holder's medical information/history and card account funds" |

Dkt. No. 46, Ex. A at 1; Dkt. No. 58 at 13; Dkt. No. 59 at 6; Dkt. No. 62, Ex. A at A-1.  The parties submit that this term appears in Claim 32.  Dkt. No. 46, Ex. A at 1; Dkt. No. 62, Ex. A at A-1.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a card that allows access to a database containing medical information."  Plaintiff agreed with the Court's preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff submits: "Defendants have erroneously included a term 'medical services card' for construction that does not exist in the claims.  There is no such thing as a 'medical services card.'  Instead, the term is only used in Claim 32 and only as a combined term — 'debit/medical services card.'"  Dkt. No. 58 at 13.  Plaintiff urges that "there is no separate card (a debit card) in

Claim 32, only a card that provides access to a system that includes a processing hub that can access 'a first database when the card functions as a debit card and . . . a second database when the card functions as a medical card.'" *Id.* at 14.

Defendants argue this term together with the term "medical card," which is addressed above. *See* Dkt. No. 59 at 6–10.

Plaintiff replies that "Defendants improperly attempt to conflate a 'medical services card' and a 'medical card,' which violates the principles of claim differentiation." Dkt. No. 60 at 10.

At the April 14, 2021 hearing, the parties argued this term together with the term "debit/medical services card."

(b)  Analysis

Claim 32 recites (emphasis added):

32.  A multifunction card system comprising:
a. at least one *debit/medical services card* having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
d. said processing hub accessing a first database when the card functions as a *debit card* and said processing hub accessing a second database when the card functions as a *medical card*.

In light of the construction of the larger term "debit/medical services card" (above), as well as with the context provided by the subsequent recitals of a "debit card" (discussed below) and a "medical card" (discussed above), the patentee used the term "medical services card" as a synonym for "medical card."

Plaintiff argues that finding these terms synonymous "violates the principles of claim differentiation." Dkt. No. 60 at 10 (citing *Phillips*, 415 F.3d at 1314, *Ortho-McNeil Pharm., Inc.*

24

*v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1327–28 (Fed. Cir. 2007) & *Anchor Wall Sys. Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003)).  But although using different terms to have the same meaning may be "poor drafting practice," the inference that different terms have different meanings "is not conclusive; it is not unknown for different words to be used to express similar concepts."  *Bancorp Servs., LLC v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004).  Plaintiff's arguments and authorities are unpersuasive, and nothing in the specification is inconsistent with reading these terms as synonymous.  Indeed, the terms "medical card" and "medical services card" do not appear anywhere in the patent other than in the claims.  Further, Plaintiff does not demonstrate that the word "services" has any special significance here.  Instead, the operative word appears to be "medical."

The Court therefore hereby construes **"medical services card"** to mean **"a card that allows access to a database containing medical information."**

**5.  "debit card"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "a card (not a pre-paid, credit, electronic gift certificate, or loyalty card) issued by a bank that provides access to funds from an accountholder's non-medical savings or checking account" |

Dkt. No. 46, Ex. A at 1; Dkt. No. 58 at 14; Dkt. No. 59 at 11; Dkt. No. 62, Ex. A at A-1.  The parties submit that this term appears in Claim 32.  Dkt. No. 46, Ex. A at 1; Dkt. No. 62, Ex. A at A-1.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "plain and ordinary meaning."  Plaintiff agreed with the Court's preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that "Defendants seek a construction of the well-known term 'debit card' to *exclude* medical savings and checking accounts even though the context of the claim does not support such a conclusion."  Dkt. No. 58 at 14.  Plaintiff submits:

> A readily understandable definition, which has not changed since the filing of the application for the '608 Patent, is simply: "A debit card is a payment card that deducts money directly from a consumer's checking account to pay for a purchase." *See, e.g.,* https://www.investopedia.com/terms/d/debitcard.asp.   This current definition is consistent with common usage [of] the term at the time of application. *See, e.g.,* https://www.nytimes.com/1997/04/02/business/not-all-plastic-is-created-equal-when-it-comes-to-renting-a-car.html.   (Saul Han[se]ll, []*Not All Plastic Is Created Equal When It Comes To Renting A Car*, New York Times, April 2, 1997.) ("Charges on debit cards, which go under many names, come directly out of a customer's checking account almost immediately rather than appearing on a monthly credit card statement.  And in contrast to using a credit card, which the debit cards physically resemble, no loan is involved in the transaction.").

*Id.* at 15.  Plaintiff also argues that "debit cards need not be issued by a bank only by a banking institution (*e.g.*, credit unions also provide such cards)."  *Id.* (citing '608 Patent at 1:11–13).

Defendants respond that "[t]he '608 Patent draws a firm and unwavering distinction between debit cards and various other types of cards . . . ."  Dkt. No. 59 at 11 (citing '608 Patent at 4:14–19).  Defendants also argue:

> As the '608 Patent uniformly explains, when the claimed multifunction card is used as a "medical services card" (synonymous with "medical information card" and "medical card"), the card accesses and retrieves the patient's (card holder's) medical history from a separate and distinct "medical information database 207." '608 Patent at 10:9–15.  Thus, the "debit card" functionality is for "non-medical" funds, and the "medical services card" functionality is directed to "medical" history and medical funds.

*Id*. at 12–13.

Plaintiff replies that "the term 'debit card' is used to describe how the 'debit/medical services card' has the ability to authorize debit transactions related to medical services; therefore,

the Court should decline to construe this term because the term is consistent with that plain and ordinary meaning." Dkt. No. 60 at 10.

At the April 14, 2021 hearing, Defendants urged that a "debit card" provides access to funds, not information.

(b)  Analysis

The Background of the Invention section of the specification includes a subsection titled "Debit Cards," which states:

I.  Debit Cards

Banking institutions often issue debit cards to their customers to give them access to funds from their savings or checking accounts. Such a debit card might be an on-line debit card or an off-line debit card. On-line debit cards, often referred to as automatic teller machine (ATM) cards, require a personal identification number (PIN) to be entered into an ATM or point-of-sale (POS) device in order to authorize the transaction. Once completed, the transaction clears the bank account immediately. Off-line debit cards function like credit cards, and usually carry the VISA® or MasterCard® logo. A retailer processes the card like a credit card and the customer signs a receipt. The funds then clear the bank account in one to three days.

While such debit cards are extremely useful and provide convenience for bank depositors, they generally do not serve a plurality of functions. Therefore, there is a need in the art for a debit/credit card capable of performing a plurality of functions, such as an electronic gift certificate card, a prepaid phone card, and a loyalty card, all in a real-time secure environment. There is also a need in the art for a system which can provide a card substitute for travelers checks and money orders which can be accepted by any POS device or ATM for financial transactions. Further, there is a need for a processing center which can manage such a multifunction card system.

'608 Patent at 1:10–35.

As to Defendants' proposal of requiring providing access to a "non-medical savings or checking account," Defendants highlight a distinction in the specification between a "medical information database 207" and other databases. *See id.* at 10:7–47. Defendants identify no disclosure, however, that would preclude a debit card from being used to access an account that

27

holds medical funds or otherwise using a debit card to pay for medical expenses.  Instead, the specification discloses generically that "the system 108 also allows access to a database which maintains the medical funds for the cardholder."  *Id.* at 10:42–44.[1]

Likewise, Defendants highlight disclosure in the specification that "[t]he present invention is a multifunction card system which allows for the activation of prepaid phone cards and the use of Electronic Gift Certificate™ cards, loyalty cards, debit cards, and medical information cards" ('608 Patent at 4:14–19), but Defendants fail to demonstrate how this distinction between "debits cards" and "medical information cards" purportedly precludes a "debit card" from being used to pay for medical services or to access an account that holds medical funds.  *See* Dkt. No. 59 at 11.

As to Defendants' proposed parenthetical distinguishing between "debit cards" and prepaid cards, credit cards, loyalty cards, and electronic gift certificate cards, introducing this exclusionary language would tend to confuse rather than clarify the scope of the claims, and Defendants fail to demonstrate the necessity of burdening the construction with this language.  Instead, the above-reproduced disclosure confirms that the plain meaning of "debit card" is distinct from prepaid cards, credit cards, loyalty cards, and electronic gift certificate cards.

Finally, as to Defendants' proposal of requiring that a debit card must be issued by a "bank," the above-reproduced disclosure refers to debit cards issued by "banking institutions," which evidently is broader than Defendants' proposal of "bank."  '608 Patent at 1:11–13. Moreover, the Field of the Invention section at the beginning of the specification states that "[t]he

---

[1] Defendants also argue: "While the 'debit card' database ('first database') is for typical savings and banking account funds, AlexSam also admits that the 'second database' 'keeps track of and maintains medical funds as a means for obtaining medical services.'"  Dkt. No. 59 at 13 (quoting Dkt. No. 58 at 28).  The portion of Plaintiff's opening brief quoted by Defendants, however, does *not* describe the "second database" or the "medical information database 207" as maintaining medical funds.  Rather, Plaintiff's brief argues that there is another database, *distinct from* the "medical information database 207," that maintains medical funds.  *See* Dkt. No. 58 at 28 ("[T]he Specification identifies a separate database (*i.e.*, not database 207) that keeps track of and maintains medical funds as a means for obtaining medical services.") (emphasis omitted).

present invention relates generally to *debit card* systems, *both bank-issued and non-bank-issued* . . . ." *Id.* at 1:4–5 (emphasis added).

The Court therefore hereby expressly rejects Defendants' proposed construction.  No further construction is necessary.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commcn's, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The Court therefore hereby construes **"debit card"** to have its **plain meaning**.

## 6. "a unique identification number"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary; Plain and ordinary meaning; Not Indefinite | Indefinite |

Dkt. No. 46, Ex. A at 2; Dkt. No. 58 at 16; Dkt. No. 59 at 13; Dkt. No. 62, Ex. A at A-2.  The parties submit that this term appears in Claims 32 and 33.  Dkt. No. 46, Ex. A at 2; Dkt. No. 62, Ex. A at A-2.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "plain and ordinary meaning."  Plaintiff agreed with the Court's preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that this term is not indefinite because:

> First, a description and examples of a UIN [(Unique Identification Number)] are provided in the Specification.  *See e.g.,* Ex. A ['608 Patent] at 3:11–15 and 3:42– 46.  Second, the '608 Patent explains that a UIN is encoded on a card.  *See id.* at 3:12–13.  Also, a UIN is part of the card's activation data.  *See id.* at 3:18–20. Further, a UIN includes a bank identification number corresponding to the card system.  *See id.* at 3:38–41.  Finally, the UIN is in fact expressly disclosed and claimed as "comprising a bank identification number" and a "medical identification number."  *Id.* at Claims 32 and 33.

Dkt. No. 58 at 16.  Plaintiff also notes that claim constructions in prior cases have not found indefiniteness and instead have found no construction necessary, have construed the term, or have included the term in the constructions of other terms.  *Id.* at 16–17.

Defendants respond: "This term is indefinite as there are two '*a* unique identification number' in Claim 32, and Claim 33 recites '*the* unique identification number' without identifying which of the two 'unique identification number[s]' in Claim 32 it refers.  It is also unclear what these purportedly unique identification numbers *are unique to*."  Dkt. No. 59 at 13.  Defendants also submit that "under the applicable standard, ISO 7812, there is no leading number that can be associated with both a banking/financial account and a medical account."  *Id.* at 14.  Further, Defendants argue that bank account identification numbers are associated with bank accounts, which may have multiple account holders, so it is unclear how to "have the same number that identifies a bank account also identify an individual's health records."  *Id.* at 15.

Plaintiff replies that both instances of "a unique identification number" in Claim 32 refer to the same unique identification number of the card.  Dkt. No. 60 at 6.  Plaintiff also argues that the claim sets forth no requirement for identifying one specific person.  *See id.* at 6–7.

At the April 14, 2021 hearing, Defendants reiterated arguments set forth in their briefing. Plaintiff responded that the meaning of this term is clear in the context in which the term appears in the claims.

<u>(b)  Analysis</u>

Claims 32 and 33 recite (emphasis added):

32.  A multifunction card system comprising:
       a. at least one debit/medical services *card* having *a unique identification number* encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
       b. a transaction processor receiving *card data* from an unmodified existing standard point-of-sale device, said card data including *a unique identification number*;
       c. a processing hub receiving directly or indirectly said *card data* from said transaction processor; and
       d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when *the card* functions as a medical card.

33. The multifunction card system of claim 32, wherein *the unique identification number* further comprises a medical identification number.

The Federal Circuit in *Microprocessor Enhancement* stated that "the patentee's mere use of a term with an antecedent does not require that both terms have the same meaning."  520 F.3d at 1375.  The Federal Circuit distinguished its *Process Control* case, in which the court found that multiple instances of "discharge rate" referred to the same rate.  *See id.* at 1375–76.   In *Microprocessor Enhancement*, the court reversed a finding of indefiniteness that was based on the claims reciting multiple instances of "condition code," "the condition code," and "said condition

code," and the court explained that "the appropriate meaning of 'condition code' is readily apparent from each occurrence in context."  *Id.* at 1376.

In the present case, however, a fair reading of Claim 32 is that the second instance of "a unique identification number" (in limitation "b") refers back to the first instance of "a unique identification number" (in limitation "a").  This is apparent when the claim is read as a whole because, for example, the recital of the operation of the processing hub in limitations "c" and "d" involves the "card data" recited in limitation "b" *and also* refers to "the card" that is first introduced in limitation "a."  *See Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms"); *see also Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) ("[T]his court does not interpret claim terms in a vacuum, devoid of the context of the claim as a whole.") (citations omitted).  The recital of "the unique identification number" in Claim 33 then refers to the same "unique identification number" recited throughout Claim 32.  The opinion of Defendants' expert to the contrary is unpersuasive.  *See* Dkt. No. 59, Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶ 85.

This is consistent with disclosures in the specification that an identification number is encoded on a card:

> To access these POS devices, the operator of the system 108 must apply for and obtain a Bank Identification Number (BIN) from the American Banking Association.  The BIN serves as a unique identifier of the multifunction card system 108 within the banking network.  The BIN is encoded on a magnetic strip 106 on each card 101 in the system 108 as a part of the card's *identification number*.  Alternatively or additionally, the BIN and *identification number* could be encoded as a bar code, embossed on the surface on the card 101 in numerals for manual entry, or provided by any other means known in the art.

'608 Patent at 4:36–46 (emphasis added).

The remaining issue is whether these claims are unclear as to the meaning of "unique."  As a threshold matter, Plaintiff notes that the parties in *Humana* agreed to "no construction necessary"

for the term "unique identification number." *Humana* at 8.  This agreed-upon construction in *Humana* is of some (albeit limited) persuasive value.  Plaintiff also cites the *Green Dot* case, in which the Central District of California found that the term "unique identification number" "do[es] not require the Court's construction." *Green Dot* at 25.  Further, in *IDT*, the parties presented competing proposed constructions, and the Court adopted the agreed-upon portion of those competing construction by construing "unique identification number" to mean "a one of a kind identification number." *IDT* at 18–19.

Thus, prior constructions of the disputed term have had no difficulty with the meaning of "unique" in the context of these claims.  Defendants argue that as to the first digit of an identification number, "under the applicable standard, ISO 7812, there is no leading number that can be associated with both a banking/financial account and a medical account." Dkt. No. 59 at 14 (citing Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶ 93).  Even assuming for the sake of argument that ISO 7812 is applicable and that a financial "leading number" cannot be used as part of a medical identification number, Defendants do not show that the requirement in Claim 33 of "the unique identification number further comprises a medical identification number" necessarily affects the leading number.  That is, "further compris[ing] a medical identification number" could refer to a portion of the unique identification number that does not include the leading number.

Finally, Defendants submit that a person of ordinary skill in the art ("POSITA") "would have understood bank identification numbers to identify accounts, not individuals," and "[i]t would thus be unclear to a POSITA how to resolve the common issue of joint bank accounts to have the same number that identifies a bank account also identify an individual's health records." *Id*. at 14–15 (citing Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶¶ 101–03).  Defendants' argument in this regard, and the corresponding opinions of Defendants' expert (*see id.*), are unpersuasive because

Defendants identify no claim language, definition, or disclaimer requiring a "unique identification number" to be associated with a specific person (rather than, for example, with an account).

The meaning of "unique identification number" is therefore sufficiently clear in the context of Claims 32 and 33. *See Kyocera*, 545 F.3d at 1347 ("[T]his court does not interpret claim terms in a vacuum, devoid of the context of the claim as a whole.") (citations omitted). The opinions of Defendants' expert to the contrary are unpersuasive. *See* Dkt. No. 59, Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶¶ 86–104.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. Defendants present no alternative proposed construction, so no further construction is necessary.

The Court accordingly hereby construes **"a unique identification number"** to have its **plain and ordinary meaning**.

### 7. "encoded"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary; Plain and ordinary meaning<br><br>Alternatively:<br>    "placed into a code" | "coded on a magnetic strip of a card or as a bar code"[2] |

Dkt. No. 46, Ex. A at 2; Dkt. No. 58 at 18; Dkt. No. 59 at 15; Dkt. No. 62, Ex. A at A-3.  The parties submit that this term appears in Claim 32.  Dkt. No. 46, Ex. A at 2; Dkt. No. 62, Ex. A at A-3.

---

[2] Defendants previously proposed: "Coded on a magnetic strip of a card." Dkt. No. 46, Ex. A at 2. Defendants submit: "Defendants have slightly broadened their original construction to reference 'a bar code.'" Dkt. No. 59 at 15 n.6.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "plain and ordinary meaning."  Both sides agreed to the Court's preliminary construction.

The Court therefore hereby construes **"encoded"** to have its **plain and ordinary meaning**.

### 8.  "a bank identification number approved by the American Banking Association"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a numeric code which identifies a card-issuing financial institution and that is sanctioned by the American Bankers Association" | "a numeric code that identifies a card-issuing financial institution and that is obtained from or approved by the American Banking Association" |

Dkt. No. 46, Ex. A at 2; Dkt. No. 58 at 19; Dkt. No. 59 at 16; Dkt. No. 62, Ex. A at A-3.  The parties submit that this term appears in Claim 32.  Dkt. No. 46, Ex. A at 2; Dkt. No. 62, Ex. A at A-3.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a numeric code that identifies a card-issuing financial institution and that is sanctioned by the American Bankers Association."  Plaintiff agreed with the Court's preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that "[t]he problem with the Defendants' proposed construction, which is the same proposed construction and argument that other alleged infringers have attempted in the past, is that there is no American *Banking* Association, and the reference to it in the claims is a simply typographical error."  Dkt. No. 58 at 19.  Plaintiff asserts that correcting this so as to refer to "Bankers" instead of "Banking" satisfies the necessary conditions for judicial correction.  *Id.*

Defendants respond that the claim must be interpreted as written and, moreover, "the patentee repeatedly used the claim term 'American Banking Association' when making

amendments to overcome cited prior art."  Dkt. No. 59 at 16–17.  Defendants also argue that "the complete absence of 'American Bankers Association' in any of the intrinsic evidence distinguishes this case from situations where courts corrected typographical errors."  *Id.* at 17.

Plaintiff replies that "Defendants are making the exact same argument that the defendants in *AlexSam v. DataStream* made, and this Court rejected."  Dkt. No. 60 at 1.

At the April 14, 2021 hearing, the parties presented no oral argument and instead rested on their briefing.

(b)  Analysis

Judicial correction of an error in a patent may be available "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."  *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003); *see Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005) ("we have held that in some circumstances the district court can correct errors retroactively"; discussing *Novo*).  Defendants emphasize the general principle of construing a claim "as written, not as the patentees wish they had written it."  *See, e.g., Chef Am. Inc. v. Lamb Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

Claim 32 recites (emphasis added):

32.  A multifunction card system comprising:
    a.  at least one debit/medical services card having a unique identification number encoded on it comprising *a bank identification number approved by the American Banking Association* for use in a banking network;
    b.  a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
    c.  a processing hub receiving directly or indirectly said card data from said transaction processor; and

       d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

The specification discloses:

> To access these POS devices, the operator of the system 108 must apply for and obtain a *Bank Identification Number (BIN) from the American Banking Association*. The BIN serves as a unique identifier of the multifunction card system 108 within the banking network. The BIN is encoded on a magnetic strip 106 on each card 101 in the system 108 as a part of the card's identification number. Alternatively or additionally, the BIN and identification number could be encoded as a bar code, embossed on the surface on the card 101 in numerals for manual entry, or provided by any other means known in the art.
>
> *Preferably, the BIN's first digit will be the same number as the first BIN digit used by a popular card issuer.* This is because POS devices are preprogrammed to recognize only certain types of cards, such as those issued by VISA® and MasterCard®, American Express®, etc. As a rule, these POS devices must be reprogrammed before they will accept a new type of card. However, since POS devices already recognize cards issued by these popular card issuers, a new type of card will also be recognized by such devices if it has a BIN that begins with the same number used by one of the popular card issuers. Since VISA® and MasterCard® are the most universally accepted cards, the BIN of the multifunction card system 108 of the present invention preferably will begin with the same number used by either VISA® or MasterCard® (i.e., "4" or "5", respectively). By using one of these numbers, the card 101 will be recognized by almost all existing POS devices 105 as a debit or credit card, and its transactions will be automatically routed by the banking system to the correct destination. This occurs regardless of the type of POS device 105 used, since all such devices are designed to interface with the banking network. Although the BIN number will preferably begin with a "4" or "5", it may begin with any number that is recognized by POS devices 105.

'608 Patent at 4:36–5:3 (emphasis added).

       A person of ordinary skill in the art would understand from the claim language and this disclosure in the specification that the patentee intended to refer to the American Bank*ers* Association. This correction "is not subject to reasonable debate based on consideration of the claim language and the specification." *Novo*, 350 F.3d at 1357. Indeed, the parties agree that *there is no* American Bank*ing* Association but there *is* an American Bank*ers* Association that is

responsible for issuing the types of identification numbers described in the above-reproduced disclosure. *See* '608 Patent at 4:36–5:3.

Further, "the prosecution history does not suggest a different interpretation of the claims." *Novo*, 350 F.3d at 1357. Defendants submit that the patentee repeatedly used the term "American Bank*ing* Association" when making amendments to overcome cited prior art. Dkt. No. 59, Ex. 2, June 24, 1999 Amendment at 1–10 (claim amendments), 11 ("Bank identification numbers are assigned by the American Banking Association (ABA) for use in industry standard banking transactions over existing banking networks such as those utilized in the processing of credit card (e.g. Visa, MasterCard, American Express), and debit cards issued by banks."), 13 ("there is no teaching or suggestion in Stimson or any other reference to incorporate a bank identification number approved by the ABA"), 15, 19 ("Taylor contains no teaching or suggestion of incorporating bank ID numbers approved by the ABA"), 20 ("bank identification approved by the American Banking Association for use in a banking network") & 22 (similar). Defendants also argue that "[t]he patentee had ample opportunities to change the claim term had it wished to do so, but it never did," and "the patentee never sought a Certificate of Correction to alter the claim term." Dkt. No. 59 at 17.

This prosecution history, however, merely reflects repetition of the same error that appears in the above-reproduced issued claim.

Also of note, the Court in *Datastream* reached the same conclusion regarding the appropriateness of judicial correction of this error, and *Datastream* thus interpreted "American Banking Association" as referring to the American Bank*ers* Association. *See Datastream* at 5 ("there is no American Bank*ing* Association, and the reference to it in the claims is a typographical error").

The Court therefore hereby construes **"a bank identification number approved by the American Banking Association"** to mean **"a numeric code that identifies a card-issuing financial institution and that is sanctioned by the American Bankers Association."**

**9. "banking network"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a set of interconnected computers used by banks and financial institution[s] for purposes of conducting and processing financial transactions and utilizes a processing hub" | "a set of interconnected computers used by banks and financial institution[s] for purposes of conducting and processing financial transactions, and which does not include a processing hub (which term is indefinite)" |

Dkt. No. 46, Ex. A at 2; Dkt. No. 58 at 20; Dkt. No. 59 at 18; Dkt. No. 62, Ex. A at A-3.  The parties submit that this term appears in Claim 32.  Dkt. No. 46, Ex. A at 2; Dkt. No. 62, Ex. A at A-3.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which incorporates and utilizes a processing hub."  Plaintiff agreed with the Court's preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that the dispute as to "banking network" depends on the dispute regarding "processing hub," which is a disputed term addressed separately below.  Dkt. No. 58 at 20.

Defendants respond that Plaintiff fails to address the dispute. "Defendants contend the 'banking network' necessarily excludes a 'processing hub,' even if the latter purportedly takes advantage of the former."  Dkt. No. 59 at 18.

Plaintiff replies that "AlexSam is proposing the construction of 'banking network' issued in *IDT*, which specifically included the 'processing hub' into its construction of 'banking network,' based upon the prosecution history and the specification."  Dkt. No. 60 at 5.

(b)  Analysis

Claim 32 recites (emphasis added):

32.  A multifunction card system comprising:
a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a *banking network*;
b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

Defendants argue that "nothing in the claim language or the specification supports inclusion of the processing hub within the recited banking network," and "it is not possible for the processing hub to be a part of the definition of banking network, because, according to AlexSam, banking networks pre-existed the invention."  Dkt. No. 59 at 18–19.

*Datastream* construed the term "banking network" to mean "a set of interconnected computers used by banks and financial institution[s] for purposes of conducting and processing financial transactions."  *Datastream* at 11.  The parties in *UnitedHealth* agreed to this construction. *UnitedHealth* at 2.

*IDT* rejected the defendant's proposal of requiring a *bank* processing hub, but *IDT* adopted the defendant's proposal to construe "banking network" to mean "a set of interconnected computers used by banks and financial institution[s] for purposes of conducting and processing financial transactions, *and which incorporates and utilizes a processing hub*."  *IDT* at 14 (emphasis

added); *see id.* at 14 (citing prosecution history).  Later, *Best Buy* reviewed the analysis in *IDT*, including as to the prosecution history, and *Best Buy* reaffirmed that "the invention is not limited to the use of bank processing hubs."  *Best Buy* at 17; *see id.* at 14–18.  *Best Buy* adopted the *IDT* construction.  *Id.* at 18.  Also, the parties in *MasterCard* agreed to this construction.  *MasterCard* at 6.

Defendants have not justified departing from the prior constructions of this disputed term, *see, e.g., TQP*, 2014 WL 2810016, at *6 ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."), except that in the present case neither side proposes including the word "incorporates," and the parties substantially agreed at the April 14, 2021 hearing that the "processing hub" in Claim 32 is not part of a conventional banking network but rather operates *in conjunction with* such a banking network.  *See, e.g.,* '608 Patent at 4:25–29 ("In order to achieve the desired functionality, the system 108 uses existing banking networks in a unique and novel way to gain access to virtually all existing retail point-of-sale (POS) devices 105.") & 5:4–8 (referring to a "link between the processing hub 103 and the banking network").  The Court in the present case therefore omits the word "incorporates" from the construction.

Finally, to whatever extent Defendants are arguing that the term "banking network" *precludes* a processing hub from being placed *within* a banking network, the Court hereby expressly rejects any such exclusion.  Again, although the "processing hub" recited in Claim 32 would not have been present in a conventional banking network at the time of the invention, such a processing hub can operate in conjunction with a banking network.  *See id.*

The Court therefore hereby construes **"banking network"** to mean **"a set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which utilizes a processing hub."**

**10.  "transaction processor"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device"; Not Indefinite | Indefinite |

Dkt. No. 46, Ex. A at 3; Dkt. No. 58 at 21; Dkt. No. 59 at 19; Dkt. No. 62, Ex. A at A-4.  The parties submit that this term appears in Claim 32.  Dkt. No. 46, Ex. A at 3; Dkt. No. 62, Ex. A at A-4.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device."  Plaintiff agreed with the Court's preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that this term is not indefinite because "a 'transaction processor' is a long-recognized structure in the debit card industry" that receives data from point-of-sale devices and then routes the data to processing hubs.  Dkt. No. 58 at 21 (citations omitted); *see id.* at 21–24.

Defendants respond that "AlexSam and its expert have even relied on the transaction processor to oppose the ineligibility of the asserted claims," and "[a]ccordingly, it must have some specific structure, beyond a simple component that receives and forwards data, to allow it to fulfill the many functions described in the patent."  Dkt. No. 59 at 19.  Defendants argue that "neither the claims nor the specification explains what the transaction processor encompasses or how it is

able to perform all of these varying functions." *Id.* at 20.  Defendants further argue that "the term is functionally claimed, using language that describes the goal of its functions without reciting how to achieve those functions." *Id.*

Plaintiff replies that "Defendants' indefiniteness argument should be found moot" because "AlexSam acknowledges that a transaction processor was an existing component within the banking and payment industry used by merchants prior to, and after, the invention." Dkt. No. 60 at 7.  Plaintiff submits that "[w]ithin the '608 Patent, the operation of the transaction processor remains the same, except for the addition of routing information for the BINs of the multifunction cards." *Id.*

At the April 14, 2021 hearing, the parties presented no oral argument and instead rested on their briefing.

(b)  Analysis

Claim 32 recites (emphasis added):

32.  A multifunction card system comprising:
     a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
     b. a *transaction processor* receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
     c. a processing hub receiving directly or indirectly said card data from said *transaction processor*; and
     d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

*Datastream* construed "transaction processor" to mean "a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device." *Datastream* at 7.  The parties in *Humana* adopted this

construction, as did the parties in *United Health* and *IDT*.  *Humana* at 8; *UnitedHealth* at 1; *IDT* at 10.

Defendants assert that Plaintiff has relied on the transaction processor as being a specialized, unconventional component, and Defendants submit that "AlexSam and its expert have even relied on the transaction processor to oppose the ineligibility of the asserted claims."  Dkt. No. 59 at 19 (citing Dkt. No. 1, Ex. B, May 1, 2019 Zatkovich Decl. at ¶ 81).

The cited expert declaration, however, relies on the combination of a "processing hub" with a transaction processor.  *Id.* ("[T]he combination of a Processing Hub with a transaction processor and the use of a unique identification number is also unconventional.").  Indeed, in that same declaration, Plaintiff's expert describes transaction processors as follows: "*Transaction processors* – (aka retailer central processor/ bank processor) servers already utilized by retailers that will now transmit multifunction card transactions from point of sale devices to the processing hub and the banking network."  *Id.* at ¶ 47(d) (citing '608 Patent at Cl. 32(b)).  In this same declaration, Plaintiff's expert also opines:

> 63.  Most POS devices (cash registers, credit card readers, etc.) cannot connect directly to the banking network.  The transaction processor provides connectivity between the POS devices and the banking network.  The transaction processor also enables communications between the POS devices and the Processing Hub.
>
> * * *
>
> 68.  The "transaction processor" acts as a link to route and receive data between the POS device and the Processing Hub or gift certificate/loyalty card computer.  The multifunction card system disclosed in the '608 Patent can include many transaction processors, such as MasterCard, Visa, Discover, and/or the retailer.  Transaction processors are embodied as components 201, 202, 203, or 209 in Figure 2 or the '608 Patent.  '608 Patent, 6:32–34, 6:52–55, 6:34–40 respectively.

*Id.* at ¶¶ 63, 68; *see, e.g.,* '608 Patent at 6:15–16 ("the POS device 105 transmits the data either directly or via the central processor 201 to the bank processor 208").

Further, Defendants submit that "[i]f that is true and the transaction processor is some well-known, conventional component of the claimed system, rather than a novel aspect supporting the eligibility and validity of the asserted claims, then Defendants could agree that the term should be construed consistent with AlexSam's proposal: 'a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard point-of-sale retail device.'"  Dkt. No. 59 at 19.

Based on this statement by Defendants (*id.*), and based on Plaintiff's assertion that a "transaction processor" is a well-known, conventional component (*see* Dkt. No. 58 at 21–24), the Court rejects Defendants' indefiniteness argument and adopts Plaintiff's proposed construction. The Court accordingly hereby construes **"transaction processor"** to mean **"a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device."**

## 11.  "processing hub"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a computer which provides front-end POS device management and message processing for card authorizations or activations"; Not Indefinite | Indefinite |

Dkt. No. 46, Ex. A at 3; Dkt. No. 58 at 24; Dkt. No. 59 at 21; Dkt. No. 62, Ex. A at A-5.  The parties submit that this term appears in Claim 32.  Dkt. No. 46, Ex. A at 3; Dkt. No. 62, Ex. A at A-5.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a computer which provides front-end point-of-sale device management and message processing for card authorizations or activations."  Plaintiff agreed with the Court's preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that this term is not indefinite because other claim language provides context, such as the recitals that "the Processing Hub interacts with a POS device *via* the transaction processor, further informing the structure of the claimed Processing Hub."  Dkt. No. 58 at 25 (citations omitted).

Defendants respond that even though "AlexSam has championed the 'Processing Hub' as the key innovation of the '608 Patent," "the asserted claims again use functional claiming with respect to the processing hub, and they (and the specification) fail to identify what the processing hub actually is."  Dkt. No. 59 at 21; *see id.* at 21–23.  Defendants argue that "[t]he use of functional claiming at this key point of novelty, upon which AlexSam relies heavily to oppose the ineligibility of the asserted claims, renders the claims indefinite."  *Id.* at 21.

Plaintiff replies that "the specification discloses, and a POSITA would understand, how multifunction transactions originate at a POS device that will be routed via the banking network to a Processing Hub."  Dkt. No. 60 at 8.  Further, Plaintiff argues:

> Defendants also err by construing the term "Processing Hub" divorced from its context within the claim and the scope of the patent.  Here, the '608 Patent does not disclose new transactions, e.g. pre-paid card, medical information requests, etc. These were well known in the art.  *See e.g.* Dkt. No. 59-2, at 1:36–2:19, 2:52–64. Therefore, it is not the intent of the patentee to teach details of how a pre-paid phone card transaction is processed, or how a medical information card transaction is processed within the Processing Hub.  The banking institutions and merchants that already performed these functions knew how to do so.  *See In re: Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991) ("The specification need not disclose what is well known in the art").

*Id*. at 9.

At the April 14, 2021 hearing, Defendants emphasized *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) for the proposition that when a patent lacks sufficient clarity regarding an element that is the crux of a claim, then the claim is indefinite.

(b)  Analysis

Claim 32 recites (emphasis added):

32.  A multifunction card system comprising:
        a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
        b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
        c. a *processing hub* receiving directly or indirectly said card data from said transaction processor; and
        d. said *processing hub* accessing a first database when the card functions as a debit card and said *processing hub* accessing a second database when the card functions as a medical card.

Defendants argue that the term "processing hub" suffers from the "vice of functional claiming" by using "conveniently functional language at the exact point of novelty," thereby rendering the claim indefinite.  *Halliburton Energy Servs.*, 514 F.3d at 1255 (quoting *General Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 371 (1938)); *see Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353 (Fed. Cir. 2010) (improper to "recite a description of the problem to be solved while claiming all solutions to it").

*Datastream* found that the specification defines the term "processing hub" in the following disclosure:

VI.  Processing Hub Technical Details

*The processing hub 103 of the present invention provides front-end POS device management and message processing for card authorization and activations. The processing hub 103 can be implemented using any computer having acceptable processing and storage capacity.*  It preferably comprises a Stratus RADIO Cluster<sup>TM</sup>, which is a scaleable system based upon the standard Intel Pentium processor.  The Stratus RADIO Cluster<sup>TM</sup> provides the processing hub 103 with a high degree of reliability and fault-tolerance.  Since the Stratus system is scaleable, an adequate degree of redundancy can be provided in order to reduce the impact of individual failures.  In addition, as demand for the multifunction card system increases, the processing hub 103 can be scaled to meet increasing demands for

> processing power and storage availability.  The modular design of such a hub is upgradable for long term capacity planning and expansion.

'608 Patent at 10:65–11:15; *see Datastream* at 10 (citing and quoting the above-italicized portion of this paragraph).

*Datastream* construed "processing hub" to mean "a computer which provides front-end POS device management and message processing for card authorizations and activations." *Datastream* at 10.  *Humana* noted that Claim 32 was not at issue in *Datastream*, and *Humana* modified the *Datastream* construction, finding that "[b]ecause the Court agrees with Alexsam that Claims 32 and 33 do not involve activation, and these are the only claims asserted in this case, the Court will modify its previous construction to exclude 'activation' from its prior construction [of] this term."  *Humana* at 16.  *Humana* construed "processing hub" to mean "a computer which provides front-end POS device management and message processing for card authorizations."  *Id.* *UnitedHealth* adopted the *Humana* construction.  *UnitedHealth* at 2.

*IDT* discussed *Datastream* and *Humana* and found that "a processing hub could perform activations without performing authorizations."  *IDT* at 17–18.  *IDT* construed "processing hub" to mean "a computer which provides front-end point of sale device management and message processing for card authorizations or activations."  *Id.* at 18.

The *IDT* construction was also adopted as agreed-upon in *Best Buy* and in *MasterCard*. *Best Buy* at 13 and 39; *MasterCard* at 6.

Having considered the prior claim construction analysis as well as the intrinsic evidence, the Court finds that the claim language "inform[s] those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S. Ct. 2129.  The opinions of Defendants' expert to the contrary are unpersuasive.  *See* Dkt. No. 59, Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶ 106 ("The claims do not describe what the processing hub is, how the processing hub is

structured, how it receives data from the transaction processor, how it knows whether the card is being used for one function or another, or how it accesses one of two distinct databases based on how the card is being used."); *see id.* at ¶¶ 105–07, 118–23.  For example, Defendants' expert opines that banking communications and medical information communications are highly-regulated fields, but this merely reinforces that persons of ordinary skill in these arts would have a great deal of knowledge concerning the context in which a "processing hub" would operate.  *See id.* at ¶¶ 111–17.  Finally, although Defendants' arguments regarding sufficiency of disclosure may perhaps bear upon other issues, such as enablement or written description, Defendants' arguments do not demonstrate indefiniteness.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument, and the Court hereby construes **"processing hub"** to mean **"a computer which provides front-end point-of-sale device management and message processing for card authorizations or activations."**

**12. "first database when the card functions as a debit card"**

**13. "second database when the card functions as a medical card"**

| "first database when the card functions as a debit card" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a database, distinct from the second database, containing funds in a card holder's non-medical savings or checking account" |

| **"second database when the card functions as a medical card"** | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a database, distinct from the first database, containing a card holder's medical information/history and medical funds" |

Dkt. No. 46, Ex. A at 3; Dkt. No. 58 at 26; Dkt. No. 59 at 24; Dkt. No. 62, Ex. A at A-5. The parties submit that these terms appear in Claim 32. Dkt. No. 46, Ex. A at 3; Dkt. No. 62, Ex. A at A-5.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary constructions:

| <u>Term</u> | <u>Preliminary Construction</u> |
|---|---|
| "first database" | "a database that is distinct from the second database" |
| "second database" | "a database that is distinct from the first database" |

Plaintiff agreed with the Court's preliminary constructions. Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that Defendants' proposals "introduce confusion and uncertainty" and lack support in any definition or disclaimer. Dkt. No. 58 at 26. Instead, Plaintiff argues, "[d]atabases are simply places to store information, which is consistent with the use of these phrases throughout the '608 Patent." *Id.* Plaintiff further argues that "[t]here is no requirement in either the claims or specification that indicate a) that a medical services card must have access to medical information/history or b) that both medical funds and medical history must be accessed through a single database." *Id.* at 27 (citation omitted).  Plaintiff submits that a person of ordinary skill in

50

the art would recognize that "systems managing medical information/history are generally very different and distinct from systems that manage accounting and financial payments." *Id.* at 28 (citation omitted).

Defendants respond that "AlexSam . . . concedes that the 'first' and 'second' databases must indeed be distinct from one another . . . ." Dkt. No. 59 at 26 (citing Dkt. No. 58 at 26). Defendants argue that "[a]s AlexSam acknowledges that the claims require separate 'first' and 'second' databases accessed by, respectively, debit transactions ('first database') in the first instance, and medical services transactions ('second database') in the second instance, medical funds cannot be in both the first and second database." *Id.* As to the "first database," Defendants argue that "the meaning the '608 Patent gives to 'debit cards' is clear: they are common, 'typical' cards providing card holders with 'access to funds from their savings or checking accounts' and 'do not serve a plurality of functions.'" *Id.* at 24 (citing '608 Patent at 1:10–26). As to Defendants' proposal that the "second database" contains medical information and medical funds, Defendants argue that "AlexSam's argument that the plain and ordinary meaning of 'second database' encompasses some other databases (unidentified by either the patent or AlexSam) cannot stand as it would inject improper ambiguity into the scope of the claims." *Id.* at 27.

Plaintiff replies: "[T]he Court should accord these terms their plain and ordinary meaning because the only requirement is that there are two distinct databases where one database is accessed during a debit card transaction and a second database is accessed during a medical services transaction.  No content is required, other than by the names of the databases themselves." Dkt. No. 60 at 10.

At the April 14, 2021 hearing, Defendants reiterated that these are distinct and different databases.  Plaintiff responded that the patent-in-suit does not preclude a particular database from holding multiple different types of information.

(b)  Analysis

Claim 32 recites (emphasis added):

32.  A multifunction card system comprising:
      a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
      b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
      c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
      d. said processing hub accessing a *first database when the card functions as a debit card* and said processing hub accessing a *second database when the card functions as a medical card*.

As to Defendants' proposal that the databases must be distinct from one another, Plaintiff acknowledges that "there are two distinct databases where one database is accessed during a debit card transaction and a second database is accessed during a medical services transaction."  Dkt. No. 58 at 28.

Defendants further propose distinguishing between a database containing "funds in a card holder's non-medical savings or checking account" and a database containing "medical funds."

The specification discloses:

[T]he multifunction card system 108 of the present invention is capable of providing an information retrieval card.  In an exemplary embodiment, a medical information card which allows access and retrieval of a patient's complete medical history from a multitude of remote locations is provided.  Each participating patient's medical information is stored in a record in a medical information database 207 maintained at the processing hub 103.  The record contains the identification number encoded on the patient's card 101.

When medical history information data is needed, it may be requested by swiping the card 101 through a POS device 105 at a participating doctor's office or hospital. Preferably, a PIN is entered into the POS device 105 to ensure that only an authorized person is able to request the information.  The POS device 105 would then send the request to the processing hub 103 via one of the routes described above.  When the processing hub 103 receives the request from the authorized requester, it then immediately sends the information to the requestor via means preselected by the participating doctor's office or hospital.  Such means may include electronic mail, facsimile, voice response, and other similar means.  The medical history information may be updated by the patient or his or her doctor or insurer by forwarding new information to the operator of the system 108 via an on-line connection, over the Internet, by telephone, by facsimile, or by mail.

* * *

In order to allow a cardholder to keep track of medical savings accounts or various other means for paying for medical services (e.g., Medicare), the system 108 also allows access to a database which maintains the medical funds for the cardholder. As described above under the Electronic Gift Certificate$^{TM}$ section, the system 108 is able to authorize, reject, and cause money to be transferred based upon the cardholder's available medical funds.

'608 Patent at 10:8–47.

Defendants identify no disclosure, however, that precludes a debit card from being used to access an account that holds medical funds.  Instead, the specification discloses generically that "the system 108 also allows access to a database which maintains the medical funds for the cardholder."  *Id.* at 10:42–44.  Defendants do not demonstrate that medical funds and medical history, for example, need to be accessed through a single database.

As to the proper constructions, Plaintiff argues that "[n]o content is required, other than by the names of the databases themselves."  Dkt. No. 60 at 10.  Plaintiff thus essentially argues that the "first database" and "second database" could be any two databases that are distinct from one another.  Dkt. No. 58 at 28–29.  Plaintiff therefore proposes "plain and ordinary meaning" for both of the disputed terms here at issue.  *Id.* at 28.

53

Although Plaintiff's proposal that the recited databases need only be distinct from one another appears, at first blush, to fail to give meaning to the disputed terms, neither the disputed terms nor surrounding claim language limit the nature of these databases.  Instead, these databases are recited generically as a "first" database and a "second" database.  *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("The use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation."); *cf. Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348 (Fed. Cir. 2005) ("In this case, the claims include two arms, and the claims' use of the terms 'first pivot point' and 'second pivot point' distinguishes the pivot point on the 'first extension arm' from the pivot point on the 'second extension arm.'  'First' does not denote spatial location, that is, it does not suggest where on the 'first extension arm' or the 'second extension arm' the pivot points are located.  The correct construction of the word 'first' merely associates the first pivot point with the first extension arm . . . .").

Defendants' proposals, which would limit these disputed terms to specific features of particular disclosed embodiments, are therefore rejected.  *See Phillips*, 415 F.3d at 1323.  Finally, the Court construes only the terms "first database" and "second database" because the present dispute is focused on the nature of the databases rather than on "when the card functions as a debit card" or "when the card functions as a medical card."

The terms "first database" and "second database" should therefore be construed as distinct from one another.  Admittedly, defining "first database" and "second database" with reference to one another is circular, and circularity in claim constructions is generally disfavored. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1086, 1090 (Fed. Cir. 2003) (rejecting construction of the term "Internet *address*" as meaning "a particular host on the Internet, specified by a *uniform*

*resource locator* that is unique to that host" because the district court construed "*uniform resource locator*" to mean "the complete *address* of a site on the Internet specifying both a protocol type and a resource location") (emphasis added).  This is appropriate in the present case, however, to give effect to the distinction between the "first database" and the "second database."  *See 3M*, 350 F.3d at 1371 (quoted above); *cf. Free Motion*, 423 F.3d at 1348 (quoted above).

At the April 14, 2021 hearing, the parties agreed that these databases must be distinct from one another, but Plaintiff expressed some uncertainty regarding the meaning of "distinct" in the context of databases.  Based on the intrinsic evidence now before the Court, however, any dispute regarding "distinct" relates to factual issues of infringement rather than any legal question for claim construction.  *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact"); *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("[t]he resolution of some line-drawing problems . . . is properly left to the trier of fact") (citing *PPG*, 156 F.3d at 1355); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806).

The Court therefore hereby construes "first database" and "second database" as set forth in the following chart:

| Term | Construction |
|---|---|
| **"first database"** | **"a database that is distinct from the second database"** |
| **"second database"** | **"a database that is distinct from the first database"** |

**14. "medical identification number"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a number used for identification purposes associated with a record in a database containing medical information" | "a number used for identification purposes that is associated with a record in a database containing a card holder's medical information/history and medical funds" |

Dkt. No. 46, Ex. A at 3; Dkt. No. 58 at 29; Dkt. No. 59 at 27; Dkt. No. 62, Ex. A at A-6.  The

parties submit that this term appears in Claim 33.  Dkt. No. 46, Ex. A at 3; Dkt. No. 62, Ex. A

at A-6.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with

the following preliminary construction: "a number used for identification purposes associated with

a record in a database containing medical information."  Plaintiff agreed with the Court's

preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff submits that its proposal is consistent with the Court's analysis in *Humana*.  Dkt.

No. 58 at 29.

Defendants respond that "[t]he parties' respective positions on this term largely mirror their

disputes concerning 'Medical Card'/'Medical Services Card' and the 'Second Database When the

Card Functions as a Medical Card.'"  Dkt. No. 59 at 28.  Defendants argue that whereas the parties

"agree that the term is a number used for identification purposes associated with a record in a

database containing medical information," Plaintiff "attempt[s] to omit the fact that it is a

cardholder's medical information and that the information includes the cardholder's medical

history and medical funds."  *Id.*  Defendants "respectfully submit that the *Humana* construction

was founded upon a mistaken reliance upon different claims using a 'single identification number,'

not a 'medical identification number.'"  *Id.*  That is, Defendants argue that Claim 13, cited by

*Humana* in its analysis, is not analogous to Claim 33, which is the claim here at issue.  *Id.*

Plaintiff replies that "[t]here is simply nothing in the language of the claims, or the

remainder of the specification, that requires the *medical* identification number to be used to access

either 'medical history' or 'medical funds.'"  Dkt. No. 60 at 5.

At the April 14, 2021 hearing, the parties presented no oral argument and instead rested on

their briefing.

(b)  Analysis

Claims 32 and 33 recite (emphasis added):

32.  A multifunction card system comprising:
   a. at least one debit/medical services card having a unique identification
number encoded on it comprising a bank identification number approved by the
American Banking Association for use in a banking network;
   b. a transaction processor receiving card data from an unmodified existing
standard point-of-sale device, said card data including a unique identification
number;
   c. a processing hub receiving directly or indirectly said card data from said
transaction processor; and
   d. said processing hub accessing a first database when the card functions as
a debit card and said processing hub accessing a second database when the card
functions as a medical card.

33.  The multifunction card system of claim 32, wherein the unique identification
number further comprises a *medical identification number*.

*Humana* analyzed this term as follows:

On this term, the parties disagree as to what a medical database record entails.
Because Humana seeks to limit the database to one containing only medical history
information, it argues that the record being retrieved using a "medical identification
number" has to be a patient's record containing medical history information.  . . .
Humana argues that [the] phrase "medical-related data" as proposed by Alexsam is
too broad.

The specification does not recite the term "medical identification number."  The
only related disclosure is of an "identification number encoded on the patient's
card" that is used to pull a record containing a patient's medical information stored

in a medical information database. *See* '608 patent, 10:7–12. The Court has, however, construed the term "medical card" to include databases that contain "medical information." Furthermore, the claims allow for the use of single identification number that can be used to access different types of databases. *See, e.g.,* '608 patent, cl. 13. Therefore, it is inappropriate to limit the scope of this term to patient medical history information alone.

*Humana* at 12.

*Humana* then construed "medical identification number" to mean "a number used for identification purposes associated with a record in a database containing medical information" (*id.*), and this is the construction that Plaintiff proposes in the present case.

Defendants note that *Humana* cited Claim 13, which recites "a single identification number," but *Humana* did construe "medical identification number" so as to refer to medical information. That is, *Humana* cited Claim 13 merely as further support that "the claims allow for the use of [a] single identification number that can be used to access different types of databases." *Id. Humana* concluded that "it is inappropriate to limit the scope of this term to patient medical *history* information alone." *See id.* (emphasis added). Also, as discussed above regarding the term "medical card," *Humana* rejected a proposal to require access to medical *history*. *See Humana* at 10–12.

As to Defendants' proposal of referring to "medical funds," the specification discloses that "the system 108 also allows access to a database which maintains the medical funds for the cardholder." *Id.* at 10:42–44. Particularly in light of this generic reference to "a database" (*id.*), Defendants do not show that these medical funds must be contained within a database record associated with a medical identification number. Finally, Defendants do not adequately justify their proposal that the medical information associated with a particular medical identification number must necessarily be of a "card holder."

The Court therefore hereby construes **"medical identification number"** to mean **"a number used for identification purposes associated with a record in a database containing medical information."**

### 15.  "unmodified existing standard point-of-sale device"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a terminal for making purchases of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system" | "a terminal for making purchases of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system"<br><br>The phrase "of the type in use as of July 10, 1997" modifies the word "terminal," not "purchases." |

Dkt. No. 46, Ex. A at 4; Dkt. No. 58 at 30; Dkt. No. 59 at 29; Dkt. No. 62, Ex. A at A-4.  The parties submit that this term appears in Claim 32.  Dkt. No. 62, Ex. A at A-4.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a terminal, for making purchases, that is of the type in use as of July 10, 1997, and that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system."  Both sides agreed to the Court's preliminary construction.

The Court therefore hereby construes **"unmodified existing standard point-of-sale device"** to mean **"a terminal, for making purchases, that is of the type in use as of July 10, 1997, and that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system."**

## V.  CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 20th day of April, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE